### THE MENGEL CO. v. LEHMAN et al.

Court of Appeals of Kentucky.

June 19, 1953.

James U. Smith, Jr., Louisville, Smith & Smith, Louisville, for appellant.

E. R. Gentry, Louisville, Michael M. Hellmann, Louisville, for appellee.

STEWART, Justice.

This is a compensation case, and it is the contention of Mary K. Lehman that her husband, Oscar Lehman, died as a result of inhaling poisonous gas or fumes while performing a welding operation on January 11, 1951, at the general machine shop of The Mengel Company in Louisville, hereinafter referred to as "the company." The company takes the position that Lehman died of a heart attack which was in no way connected with his employment. Additionally, it is asserted the proof failed to establish (a) that the employee actually inhaled gas or fumes, or (b) that such gas or fumes so inhaled were poisonous, or (c) that there was a causal connection between the work done by the employee and his subsequent death.

On April 25, 1951, Mary K. Lehman as a dependent of the decedent filed her application for an adjustment of her claim against the company with the Workmen's Compensation Board. It was stipulated that Lehman and the company had accepted and were operating under the terms of the Workmen's Compensation Act, KRS Chapter 342, and that Lehman's weekly wage would justify payment of the maximum dependency benefits under the above Act.

Upon presentation of all the proof before the referee, he concluded that Lehman's death resulted from the combined effects of a pre-existing heart condition and the toxic fumes inhaled by him during the welding operation, and, pursuant to KRS 342.070, he entered an award granting Mary K. Lehman 50% compensation benefits. Thereafter, on motion of both parties, the referee's award and opinion were submitted to the full Board and later adopted by it. The company then filed its petition in the lower court for a review of the decision of the Board. A judgment was seasonably entered affirming the award of the Board and this appeal is prosecuted therefrom by the company.

We are of the opinion that the single question presented to us for determination is whether Mary K. Lehman adduced competent evidence of probative value to support the findings of fact and the award of the Board. Numerous witnesses testified for both parties and, as a consequence, the record is a voluminous one. We deem it unnecessary to set out the testimony in detail; therefore, we shall dwell only on the evidence that we think essential to a correct disposal of this case.

Lehman, sixty years of age, had been an employee of the company for eight years prior to his death. On Thursday, January 11, 1951, he left his home in apparent good health, except that he had been suffering from a cold. There is evidence to establish that he had never sought a doctor's treatment nor lost a day's work during his period of employment with the company. On the particular morning in question, Lehman was called upon to do an intricate welding operation. The work consisted of heating a metal die to a high degree of temperature, after which it was placed upon a welding table on a brick support that raised the die above the level of the table, and the job was then completed with the use of an oxyacetylene torch, a brazing rod and a compound known as "flux". It was definitely shown that the operation resulted in the creation of heat waves, gaseous fumes, sparks and fine particles of metal which arose from the die.

Shortly after Lehman began working in the morning, he complained that the welding job was making him ill. Several fellow employees noticed that Lehman's face was quite red. Later he turned pale; he became nauseated; he went to the rest room for a spell. Afterwards he returned to his work and resumed it with a handkerchief tied over his face. There is no doubt that until this time several windows were open near Lehman and a blower fan had been on. Another employee had switched the fan off when Lehman left the job but he started it again when Lehman returned and requested him to do so. The job was completed shortly before noon, at which time Lehman's face was red, his eyes were watery and his nose appeared irritated. He did no more work that day but he did not leave the premises until sometime in the afternoon. His foreman offered to send him to a doctor. This offer Lehman refused since he had his own automobile.

At about 2:30 p. m. Lehman arrived at his home and called to his wife from the back kitchen door, complaining he was ill. He had by that time become so weak he had to be assisted to the front room by his wife and daughter-in-law where he was placed by them upon a couch. Attempts were made by the family to get a doctor but none was available until Friday morning. At that time Doctor Isadore Goldstein, a general practitioner in Louisville, arrived to treat the deceased. He found Lehman short of breath, complaining of a burning and a pressure in his chest and suffering from severe pains in that part of his body. Lehman told the doctor that in doing a welding job he had inhaled gaseous fumes somewhat different from that to which he had been accustomed and that he had immediately suffered the symptoms just indicated. Lehman was ordered to remain in bed. Two days later he took a turn for the worse and was sent to the hospital. There he died the next day.

In his deposition Doctor Goldstein stated Lehman had an old rheumatic heart disease of many years' standing. However, he added: "* * * but I imagine he had to get along with it. He could work and he did his work. He couldn't run a foot race, I don't believe, but he managed to get along, but this—whatever it was—it set off his lungs and caused his heart to blow up." On cross-examination he admitted that he was not a toxicologist and that the hospital record, under his signature, diagnosed Lehman's condition as "bronchopneumonia" and showed Lehman's death as due to "same (bronchopneumonia) and coronary artery disease," but he insisted it was his final unqualified opinion that Lehman's death occurred because "he inhaled some type of gaseous fumes that caused this chemical irritation of his lungs that eventually led to his death." Unquestionably this conclusion was induced by the autopsy report to which we shall next refer.

Doctor Malcolm L. Barnes, a practicing physician and an associate professor of pathology at the college of medicine of the University of Louisville, performed an autopsy on Lehman's body. Testifying from his findings, he said Lehman had "some arteriosclerotic disease" of the nature of hardening of the arteries. He also had an old rheumatic heart affliction. Then he made this statement: "They were innocent bystanders to the major cause of his death." When asked the direct question as to what brought about this man's decease his answer was: "I am saying positively that this man died from the inhalation of the noxious materials."

It is insisted, however, the evidence did not establish that Lehman inhaled any gas or fumes while welding, or that such gas or fumes were poisonous, or that there was a causal connection between the brazing operation and his subsequent death. We believe that none of these claims can be definitely sustained. Doctors Goldstein and Barnes testified unequivocally that Lehman's death was induced by the inhalation of gas fumes. Doctor Barnes also stated the history of Lehman's case presented all the symptoms of gaseous or metallic poisoning, namely, "acute nausea, vomiting, the flushing of the face, headaches." But let us examine some of the company's evidence on this score. A brazing rod and a substance called flux were used in this particular welding operation and it was stipulated that the brazing rod contained 24% cadmium and the flux was made up of 30.55% potassium acid fluoride. Howard C. Soehner, a chemist who testified for the company, admitted on cross-examination that potassium fluoride; when heated to a high degree of temperature, might poison a man's lungs. Doctor A. G. Cranch, another of the company's witnesses, indicated that this chemical could be quite toxic to the mucous membrane when breathed in the form of fumes. Dr. E. R. Gernert, a well known Louisville chest specialist who was called by the company, admitted on cross-examination that cadmium fumes could be breathed in sufficient doses to cause death.

The argument of the company may be boiled down to its main contention, which is that Lehman's death was wholly the result of a pre-existing disease. In this connection it relies chiefly upon the medical testimony of these witnesses placed in evidence by it. Doctor Morris M. Weiss, a heart specialist of Louisville, said: "There is no doubt in my mind that this man died from an infraction of the heart muscle." Doctor Gernert, referred to above, stated he would classify Lehman's death as cardiovascular, meaning "that his was the result of the previous trouble that he had with his heart and his vascular system." Doctor Cranch, a physician of New York City specializing in industrial medicine and to whom we have alluded, was of the opinion that Lehman died of "a congestive condition in the lungs due to poor circulation, resulting from the damage to the heart obviously in this case." These three doctors had made a detail study of the autopsy report of Doctor Barnes and developed the foregoing opinions from hypothetical questioning. Proof was adduced to the effect that the ventilating system where Lehman worked precluded the inhaling of fumes. It should also be noted that witnesses of the company, expert and lay, testified to the effect that they had never heard of any one becoming ill, much less dying, while performing a brazing or welding operation of the kind done by Lehman in this instance.

It will thus be seen that the testimony, medical and lay, introduced by the claimant is in direct conflict with that produced by the company. Ours is not the task to evaluate the evidence. We have many times written that the sole function of a court, so far as questions of fact are concerned in a compensation case, is to ascertain whether or not the record contains any competent evidence of probative value to support such factual findings of the Board, and that neither the circuit court, nor this one, is authorized to determine the weight to be given to the evidence. McDonald v. American Radiator & Standard Sanitary Corporation, Ky., 237 S.W.2d 849; Tackett v. Eastern Coal Corporation, 295 Ky. 422, 174 S.W.2d 707; and Inland Steel Co. v.

Newsome, 281 Ky. 681, 136 S.W.2d 1077. It is the established rule of this jurisdiction, and we have never departed from it, that if there is competent evidence of probative value to support the findings of the Board, it will not be disturbed by this Court on an appeal. See KRS 342.285; Utley v. Pence, 295 Ky. 673, 175 S.W.2d 372, 373; Coburn v. Eastern Coal Corporation, 290 Ky. 679, 162 S.W.2d 537; Black Mountain Coal Corporation v. Seward, 275 Ky. 177, 121 S.W.2d 4; and Three Rivers Oil Corporation v. Harper, 258 Ky. 253, 79 S.W. 2d 972. We conclude there was substantial evidence adduced to support the Board's findings in this case.

Wherefore, the judgment is affirmed.